**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SUSAN RENEAU | ) | |
| 5425 Skyway Drive, | ) | |
| Missoula, Montana 59804, | ) | |
| | ) | |
| ROBERT FIELDS | ) | |
| 1030 NW 176th Ave, | ) | Case No: 16-cv-966 |
| Beaverton, Oregon 97006, | ) | |
| | ) | |
| MARVIN KASCHKE | ) | |
| 37488 Kerr Dam Rd. | ) | COMPLAINT FOR DECLARATORY |
| Polson, Montana 59860 | ) | AND INJUNCTIVE RELIEF |
| | ) | |
| JOSEPH MAZZONI | ) | May 23, 2016 |
| 15069 Robles Grandes Dr. | ) | |
| Rancho Murieta, California 95683, | ) | |
| | ) | |
| JON MALCOLM | ) | |
| 19605 S. Cheney Spangle Rd. | ) | |
| Cheney, Washington 99004 | ) | |
| | ) | |
| DELBERT PALMER | ) | |
| 54632 Hwy 212, | ) | |
| Charlo, Montana 59824, | ) | |
| | ) | |
| MARVIN PLENERT | ) | |
| 20500 South Tranquility Ln, | ) | |
| Oregon City, Oregon 97045, | ) | |
| | ) | |
| DON REDFEARN | ) | |
| 111 San Lucas, | ) | |
| Belen, New Mexico 87002 | ) | |
| | ) | |
| WILLIAM REFFALT | ) | |
| 1050 Matador Dr. SE | ) | |
| Albuquerque, New Mexico 87123, | ) | |
| | ) | |
| DAVID WISEMAN | ) | |
| 19272 Stone Gate Dr. | ) | |
| Morrison, Colorado 80465, | ) | |
| | ) | |
| and | ) | |
| | ) | |

PUBLIC EMPLOYEES FOR                          )
ENVIRONMENTAL RESPONSIBILITY,                 )
962 Wayne Ave., Suite 610                     )
Silver Spring, Maryland 20910                 )
                                              )
    **Plaintiffs,**                          )
                                              )
    vs.                                       )
                                              )
UNITED STATES FISH AND WILDLIFE               )
SERVICE, an administrative agency of the      )
United States Department of the Interior,     )
1849 C Street NW, Room 3331                    )
Washington, DC 20240                          )
                                              )
and                                           )
                                              )
 DAN ASHE, Director, United States Fish and   )
Wildlife Service, in his Official Capacity,    )
1849 C Street NW, Room 3331                    )
Washington, DC 20240                          )
                                              )
    **Defendants,**                          )

## COMPLAINT

Plaintiffs Susan Reneau, Robert Fields, Marvin Kaschke, Joseph Mazzoni, Jon Malcolm,

Delbert Palmer, Marvin Plenert, Don Redfearn, William Reffalt, and David Wiseman, on their

own behalf; and Public Employees for Environmental Responsibility (PEER) on behalf of itself

and its members, allege as follows:

### NATURE OF ACTION

1.    This action concerns Defendants' actions in the management and operation of the

National Bison Range (NBR) within the National Wildlife Refuge System (NWRS) by the U.S.

Fish and Wildlife Service (FWS or "the Agency"). Specifically, the Defendants have announced

a legislative proposal to transfer the NBR out of the NWRS and into a trust held by the United

States for the benefit of the Confederated Salish/Kootenai Tribes (CSKT) without adequate

review under the National Environmental Policy Act (NEPA).  Further, Defendants have failed to develop a Comprehensive Conservation Plan (CCP) for the NBR in violation of the Refuge Act and the National Wildlife Refuge System Improvement Act.

2.      Plaintiffs seek a declaration that Defendants are violating NEPA, the Refuge Act, the National Wildlife Refuge System Improvement Act, and the Administrative Procedure Act (APA).

3.      Plaintiffs also seek injunctive relief directing Defendants to develop and complete a CCP for the NBR as soon as practicable.

4.      Plaintiffs further seek injunctive relief preventing Defendants from submitting FWS's legislative proposal to Congress and ordering Defendants to take no further action to sponsor, advocate for, or promote the legislation until Defendants satisfactorily fulfill their statutory obligation under NEPA to produce an Environmental Impact Statement (EIS) concerning the transfer of the NBR out of the NWRS and into a United States-held trust for the benefit of the CSKT.

5.      Plaintiffs also seek an award of attorneys' fees and expenses, and such other relief as the Court deems appropriate.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2201 (declaratory judgment).

7.      Venue in this court is proper under 28 U.S.C. § 1391(e). Defendants, having authority over the actions or inactions alleged herein, have offices located in this judicial district.

## PARTIES AND STANDING

8.      Plaintiff SUSAN RENEAU, along with being a member of PEER, is a book author and magazine columnist who has written about wildlife conservation and big-game

3

hunting since 1977. Ms. Reneau visits the NBR three or four times a year to take photos of wildlife and to drive the dirt roads to watch wildlife.  She plans on continuing to do so for the foreseeable future, including a visit this coming July.  Over the course of a year, Ms. Reneau volunteers hundreds of hours on various aspects of saving the NBR, hosting public hearings, submitting comments to FWS, and travelling the country to meet with groups about the NBR. Ms. Reneau has written books and articles about the NBR and wildlife in the NBR.    FWS's violations harm Ms. Reneau's professional, aesthetic, and recreational interests in visiting the NBR, as the absence of a CCP results in a diminished ability of FWS to effectively manage the NBR and the NEPA violation results in a legislative proposal to remove the NBR from the NWRS entirely without legally-mandated environmental review.  Both these violations interfere with Ms. Reneau's ability to write about wildlife conservation and to see bison and other wildlife in a natural setting.

9.      Plaintiff ROBERT FIELDS is a retired FWS Regional Refuge Supervisor, and PEER member, whose career working for the National Wildlife Refuge System spanned from June 1958 to January 1995; a total of 37 years. Mr. Fields served as a Refuge Manager Trainee at the National Bison Range from February 1962 to November 1963 before subsequently managing the Fort Niobrara National Wildlife Refuge, the J. Clark Salyer Refuge, and the Klamath Basin Refuges, and ultimately retiring after acting as the Regional Refuge Supervisor for California and Nevada. In retirement Mr. Fields volunteers with the Blue Goose Alliance and serves on the Board of Directors of the Friends of Midway Atoll. Mr. Fields last visited the National Bison Range in 2003 and plans on visiting the NBR in the summer of 2017.  FWS's violation of NEPA and FWS's failure to draft a CCP harms Mr. Fields' interest in a well-managed refuge in which to visit and enjoy wildlife, because the absence of a CCP diminishes the FWS's ability to

properly manage the NBR and the NEPA violation results in a legislative proposal to remove the NBR from the NWRS entirely without legally-mandated environmental review.

10.     Plaintiff MARVIN KASCHKE, a member of PEER, was the Refuge manager at the National Bison Range from 1968 to 1977 as well as the Assistant Manager at the Charles M Russell Refuge from 1960 to 1968 and the Refuge Manager at Sheldon Hart Mountain Refuge from 1977 to 1988. Mr. Kaschke last visited the National Bison Range in 2015 with friends and plans on visiting the NBR in the future. FWS's violations harm Mr. Kaschke's interests in visiting and enjoying the wildlife located on the NBR, because the absence of a CCP diminishes the FWS's ability to properly manage the NBR and the NEPA violation results in a legislative proposal to remove the NBR from the NWRS entirely without legally-mandated environmental review.

11.     Plaintiff JOSEPH MAZZONI is a member of PEER and was the Refuge Manager at the National Bison Range from May 23, 1965 to December 14, 1968. Mr. Mazzoni worked for FWS in positions relating to the administration of National Wildlife Refuges from June 1957 through January 1997; nearly 40 years.  FWS's violations of NEPA and the Refuge Act harm Mr. Mazzoni's interest that the NBR maintain its wildlife-related recreational, educational, and scientific values for himself and all Americans.

12.     Plaintiff JON MALCOLM was the Refuge Manager for the NBR from 1981 until his retirement in 1994. As NBR Refuge Manager, he spent 13 years building a staff of well-trained, experienced and skilled FWS employees and worked to achieve effective professional management and operation of the Refuge. Since his retirement, he has followed developments at the NBR, and has been active in matters concerning the NBR as a private citizen. He seeks to insure that the goals he pursued in his 13 years as Refuge Manager are furthered rather than

undermined. He is concerned that FWS's violations of both NEPA and the Refuge Act will result in damage to the quality and efficiency of management of the Refuge, and will result in a legislative proposal to remove the NBR from the NWRS entirely without legally-mandated environmental review.

13.     Plaintiff DELBERT PALMER is a retired FWS employee who worked at the National Bison Range in the maintenance department for 16 years before his retirement on December 1, 2015. His duties included grading roads, constructing buildings, and working directly with the bison, including moving them to different areas of the range. He was also sometimes detailed to other refuges around the country to manage prescribed fires and control wildfires. While employed at the NBR, Mr. Palmer received a monetary award for a new corral system.  Mr. Palmer was under an Intergovernmental Personnel Agreement (IPA) appointment to the CSKT during the second Annual Funding Agreement (AFA) with the CSKT, an agreement between the federal government and the CSKT which provided the CSKT a substantive role in mission-critical programs.  In 2007, he received an award from Rick Coleman, the FWS regional director, for extra effort towards making the AFA work. In retirement, Mr. Palmer is a member of PEER and manages 20 acres of personal property near the NBR for use as habitat for wildlife. Mr. Palmer visits the National Bison Range every two weeks for wildlife viewing and to attend meetings concerning management of the NBR. The FWS's violations of law injure Mr. Palmer's interests in viewing wildlife in the NBR and participating in meetings concerning the management of the NBR.

14.     Plaintiff MARVIN PLENERT is a member of PEER and a retired FWS Regional Director who from 1977 to 1986 worked as the Deputy Assistant Director for Refuges in the Denver Regional Office with responsibility for the oversight of all refuges within the region,

including the NBR, and from 1986 to 1989 served in Washington D.C. as the Assistant Director with responsibilities for administration of all refuges in the NWRS. Mr. Plenert retired in 1994 after transferring to Portland, OR, in 1989 as Regional Director with responsibility for all FWS activities in the six state area as well as Pacific Trust Territories. Mr. Plenert visited the NBR in 2014 on a family vacation and in 2010 for the bison round-up. Mr. Plenert plans on visiting the NBR again during the fall bison round-up as long as it is not transferred out of the NWRS. FWS's violations of law harm Mr. Plenert's interest in viewing wildlife and the remnants of the original bison herds located at NBR in a natural setting.

15.     Plaintiff DON REDFEARN is a retired NWRS Regional Supervisor whose career spans over 31 years. Mr. Redfearn began working for the FWS in 1950 at the Bitter Lake National Wildlife Refuge before transferring to the Bear River Migratory Bird Refuge. From 1958 until 1966 Mr. Redfearn served as an Assistant Refuge Manager in several refuges and as Regional Refuge Master Planner in the Albuquerque Regional Office. From February 1966 to June 1977 Mr. Redfearn was the Refuge manager at the National Elk Refuge and then served as the Regional Supervisor of all National Wildlife Refuges in Alaska until his retirement in 1982. In his personal capacity, Mr. Redfearn has visited more than 100 National Wildlife Refuges, including the National Bison Range, and he plains on visiting the National Bison Range in the future. Mr. Redfearn is also a current board member of the Blue Goose Alliance of which he is a founding member and past president. Mr. Redfearn still vigorously advocates for the conservation of wildlife and its habitat, and believes that the NWRS must be managed as a System rather than a loosely affiliated group of refuges. FWS's violations of NEPA and failure to draft a CCP harm Mr. Redfearn's interests in visiting the National Bison Range in the future and his interests that the Wildlife Refuge System be properly managed, because the absence of a

CCP diminishes the FWS's ability to properly manage the NBR and the NEPA violations results in a legislative proposal to remove the NBR from the NWRS entirely without legally-mandated environmental review. In addition, implementation of the transfer proposal would harm Mr. Redfearn's interest in the management of the Refuge System as an integrated wildlife management system, rather than a conglomeration of discrete units. The implementation of the proposed transfer would remove the NBR from the coordinated management of the Refuge System generally and the coordinated management of the Service bison herds.

16.     Plaintiff WILLIAM REFFALT is a retired FWS employee and retired Director of the National Wildlife Refuge Programs with The Wilderness Society. Mr. Reffalt is also a member of PEER. Mr. Reffalt began his career with the FWS in 1960 when he worked at several different national wildlife refuges. From 1969 to 1973 Mr. Reffalt served in the Albuquerque Regional Office as a fish and wildlife biologist and regional refuge biologist. In mid-1973, Mr. Reffalt was transferred to the DC office in the Refuge Division where he was soon elevated to Special Assistant to the Director and principal FWS officer in support for new Alaska Conservation System Units. In 1980 Mr. Reffalt was appointed Chief of Refuge Management and then in 1982 was transferred to Chief of Wildlife Management. In 1984 Mr. Reffalt accepted a position as the Director of National Wildlife Refuge Programs with The Wilderness Society where he worked on all aspects of the Refuge System from management policies to land acquisitions until his retirement in 1999. In retirement Mr. Reffalt takes an active interest in the National Wildlife Refuge System. He was a founding member of and still serves in a leadership capacity in the Blue Goose Alliance (BGA), a nonprofit organization devoted to supporting the NWRS and advocating on its behalf. Mr. Reffalt actively studies NWRS history and the history of individual refuges, including the NBR, on which he has built an extensive personal library.

Mr. Reffalt, along with his wife, visit wildlife refuges whenever he is able to travel and has as recently as 2008 visited and volunteered at the NBR. Since 2006 Mr. Reffalt has visited approximately 75 refuges in the western United States and another 24 refuges in the South and Southeastern U.S.  Mr. Reffalt hopes to visit the NBR in the near future to speak with refuge staff and view the wildlife and habitats. FWS's violations of NEPA and FWS's failure to prepare a CCP harms Mr. Reffalt's long-held interests in professionally-conducted wildlife management and wildlife habitat conservation, because the absence of a CCP diminishes the FWS's ability to properly manage the NBR and the NEPA violation results in a legislative proposal to remove the NBR from the NWRS entirely without legally-mandated environmental review

17.     Plaintiff DAVID WISEMAN is a PEER member and a retired FWS Refuge Manager and Refuge Supervisor. From 1995 to 2004 Mr. Wiseman was the Refuge Manager of the NBR, for which he received several performance awards. From 2004 until his retirement in 2007 Mr. Wiseman was the Refuge Supervisor in the Denver Regional Office where he was responsible for all operations of five refuges and the wetland management district in northwest Montana. Mr. Wiseman was also part of the AFA negotiations with the CSKT until his retirement in 2007. In retirement, Mr. Wiseman enjoys observing wildlife in National Wildlife Refuges and occasionally photographing wildlife for personal pleasure and to share with friends and family. Mr. Wiseman last visited the NBR in the spring of 2015 and plans on visiting the NBR this summer and in the future. FWS's NEPA and Refuge Act violations harm Mr. Wiseman's interest in viewing the bison in the NBR in a natural environment and his interest in the continuation of conservation efforts concerning the Bison and other wildlife in the NBR.

18.     Plaintiff PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILTY ("PEER") is a national nonprofit organization, based in Washington, D.C. with five field offices

throughout the United States.  PEER serves and protects current and former federal and state employees of land management, wildlife protection, and pollution control agencies who seek to promote an honest and open government and to help hold governmental agencies accountable for faithfully implementing and enforcing the environmental laws entrusted to them by Congress. Members of PEER retreat to the NBR to partake of its unique wildlife opportunities and have firm plans to do so again in the future.  In addition to partaking in recreational activities involving the NBR, members of PEER research and photograph the Bison located in the NBR and in other refuges in the Nation Wildlife Refuge System.

19.    FWS's decision to sponsor legislation to transfer the NBR out of the NWRS and into a trust for the benefit of the CSKT without first conducting a full EIS injures the recreational, professional, and educational interests of those PEER members who regularly view, study, write about, and photograph wildlife in the NBR. The absence of a CCP at the NBR injures these same PEER members because the absence of the required CCP, which would provide a comprehensive long-term strategy for management of the NBR with public input, in order to achieve the purposes of the NBR, diminishes and will diminish in the future the Defendants' ability to protect the biological integrity, diversity, and health of the NBR and the animals that live there.

20.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a Federal agency responsible for protecting, restoring, and managing National Wildlife Refuges. In doing so, FWS must comply with NEPA, the Refuge Act and the National Wildlife Refuge System Improvement Act.

21.     Defendant DAN ASHE, Director, UNITED STATES FISH AND WILDLIFE SERVICE, is ultimately responsible for the agency's compliance with NEPA, the Refuge Act and the National Wildlife Refuge System Improvement Act.

22.     The above-described academic, aesthetic, professional, and recreational interests of the Plaintiffs have been, are being, and will continue to be adversely affected and irreparably injured by the Defendants' failure to prepare an EIS to include in its recommendation on its proposal for legislation to remove the NBR from the NWRS and place it in trust for the benefit of the CSKT. Plaintiffs' interests are also adversely affected by the Defendants' failure to develop a CCP which would ensure that the NBR is properly managed to achieve the conservation of bison, other wildlife, and natural resources, and to appropriately operate as a unit within the NWRS.

## STATUTORY FRAMEWORK

### National Environmental Policy Act

23.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The NEPA process is meant to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment." *Id.* §1500.1(c).

24.     To accomplish these purposes, NEPA requires all federal agencies to prepare a "detailed statement" regarding "every recommendation or report on proposals for legislation." 42 U.S.C. § 4332 (C). This "detailed statement" is commonly known as an environmental impact statement.

25.     NEPA's implementing regulations were promulgated by the Council on Environmental Quality (CEQ).  The CEQ regulation at 40 C.F.R. § 1500.1(b) provides in part that: "NEPA procedures must ensure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken. The information

must be of high quality. Accurate scientific analysis, expert agency comments, and public

scrutiny are essential to implementing NEPA…"

26.     The CEQ regulation at 40 C.F.R. § 1506.1 further provides that: "(a) Until an

agency issues a record of decision [on an EIS]… no action concerning the proposal shall be

taken which would: (1) have an adverse environmental impact; or (2) limit the choice of

reasonable alternatives."

27.     40 CFR § 1506.8 requires that a legislative EIS be included in a recommendation

or report on a legislative proposal requiring Congressional approval. The EIS is considered part

of the formal transmittal of the proposal and it must be available in time for Congressional

hearings and deliberations. 40 CFR § 1506.8 (a).

*Administrative Procedure Act (APA)*

28.     The APA grants a right of judicial review to "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

29.     Under the APA, courts "shall compel agency action unlawfully withheld or

unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings,

and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," *id.* § 706(2)(A). Courts may only review a final agency action, *id.* § 704,

and "agency action" includes a "failure to act." *Id.* §551(13).

*National Wildlife Refuge System Administration Act and the National Wildlife Refuge System*
*Improvement Act*

30.     All NWRS management is governed by the National Wildlife Refuge System

Administration Act of 1966, as amended ("Refuge Act"), which formally established the

National Wildlife Refuge System.  In 1976, Congress amended the Refuge Act to provide

generally that areas included in the NWRS could not be transferred or otherwise disposed of without an Act of Congress, and that all areas within the System were to be administered by the Secretary of Interior through the FWS. 16 U.S.C. § 668dd. It also provided that: "The Secretary is authorized … to permit the use of any area within the System for any purpose … whenever he determines that such uses are compatible with the major purposes for which such areas were established." *Id.* § 668dd(d)(1)(A).

31.     In 1997, the Refuge Act was subject to major amendment in the National Wildlife Refuge System Improvement Act ("NWRS Improvement Act"). In that Act, Congress retained the provisions requiring administration of the Refuge System by the Department of Interior through the FWS. It provides that it is "[t]he mission of the NWRS … to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2).

32.     The NWRS Improvement Act also provided guidance to the FWS for the management of the System, *id.* § 668dd(a)(4), clarified the process for determining the compatibility of refuge uses, *id.* at § 668dd(d)(3)(B), and mandated a long-term comprehensive conservation plan "CCP" for each refuge, *id.* at § 668dd(e)(1)(A), (B) and (E).

33.     A CCP is a document that must "identify and describe: (1) the purposes of the refuge; (2) the fish, wildlife, and plant populations, their habitats, and the archeological and cultural values found on the refuge; (3) significant problems that may adversely affect wildlife populations and habitats and ways to correct or mitigate those problems; (4) areas suitable for administrative sites or visitor facilities; and (5) opportunities for fish and wildlife-dependent recreation. The Secretary must ensure adequate public involvement in the preparation of plans."

HR Report 105-106, National Wildlife Refuge System Improvement Act of 1997; May 21, 1997; pp. 13-14. It is "a document that describes the desired future conditions of a refuge or planning unit and provides long-range guidance and management direction to achieve the purposes of the refuge." 50 C.F.R. § 25.12. The Secretary must "prepare a comprehensive conservation plan … for each refuge within 15 years after the date of the enactment of the National Wildlife Refuge System Improvement Act of 1997," and revise the plans every 15 years thereafter. 16 U.S.C. §668dd(e)(1)(A), (B). Draft CCPs must be published in the Federal Register, with the opportunity for public comment. *Id.* § 668dd(e)(1)(A)(ii).

## FACTS

34.     The NBR was formed in 1908 within the borders of the Flathead Reservation in northwestern Montana.  It covers nearly 19,000 acres, and is one of the oldest Wildlife Refuges in the nation.  It was the nation's first wildlife conservation area established at the direction of Congress and acquired completely with funds appropriated by Congress.  Using bison that the American Bison Society purchased and donated to the federal government, it has protected and fostered the once nearly extinct American Bison for over 100 years.  The NBR's work continues to be vital to the future of the bison as a healthy, genetically pure native species.

35.     The extensive acreage of native prairie, forests, wetlands, and streams within the NBR also provide habitat for elk, deer, pronghorn antelope, bighorn sheep, black bear, and other mammals, including grizzly bears.  In addition, the NBR supports over 200 species of birds, including eagles, hawks, meadowlarks, bluebirds, ducks, and geese.  Refuge facilities include a Visitor Center, auto tour roads, walking trails, and a picnic area.

36.     The Palouse prairie grasslands of the NBR represent a type of ecosystem of which less than 1% remains. NBR's grasslands and ecosystem components are diverse, healthy, and unique in the NWRS.

37.     Congress created the NBR to provide a "permanent national bison range for the herd of bison to be presented by the American Bison Society." 16 U.S.C. § 671.   In 1921, Executive Order 3596 broadened the purpose of the NBR to include a refuge and breeding area for birds. In 2005, FWS bison managers and biologists outlined six main purposes of caring for bison on an NWR; of those purposes, bison conservation was "identified as one of national scope and thus applicable to the National Wildlife Refuge System."

38.     The FWS has a plan to manage "metapopulations" (groups of spatially separated populations of the same species) of bison on multiple refuges, with the herd at each refuge being a component of the "metapopulation" which must be managed in concert with the herds at other refuges.

39.     The bison herd at the NBR represents one of the four primary genetic lineages of extant conservation herds. The Bison Range animals contain a higher diversity of genetic alleles than any other Department of Interior herd and have unique alleles not found in other Department herds.  Because of the unique genetic diversity of the NBR herd, bison from that herd have been relocated to other Refuges at various times to establish new herds or to improve the genetic diversity of existing herds.

40.     The Bison Range holds 25.2% of the FWS bison meta-population and comprises 17.5% of current FWS land area devoted to bison management. The NBR herd, and the Refuge's management of that herd, is vital to the future of the bison as a healthy native species that is genetically pure or with very low hybridization.

41.     Between October and November 2015, FWS Director Dan Ashe and the FWS developed a plan through meetings and telephone calls for the transfer of the NBR to the CSKT. Through these conversations, a meeting was set for February 5, 2016 between the FWS and the CSKT to talk about the proposed transfer of the NBR out of the NWRS and into a trust held in benefit of the CSKT.

42.     This proposed transfer came about as the result of the breakdown of negotiations for a third AFA (a document that represents the negotiated agreement of the Secretary to fund, on an annual basis, the programs, services, activities, and functions transferred to an Indian tribe or tribal organization) between the CSKT and the FWS concerning the management of the NBR. The first AFA was in place in 2005-2006 and was ended by the FWS due to a host of performance-related issues on the part of the CSKT. The second agreement made in 2008 was invalidated in 2010 by a federal court because the FWS had failed to prepare an Environmental Assessment or Environmental Impact Statement under NEPA.

43.     On February 5, 2016, after the meeting with the CSKT, the director of the FWS's Mountain-Prairie Region, Noreen Walsh, and the Chief of the NWRS, Cynthia Martinez, sent emails to FWS staff informing them of the FWS's decision to enter discussions with the CSKT, explaining that FWS planned to support legislation that would transfer the NBR to be held in trust by the U.S. for the CSKT. These emails state that the FWS had been working with the CSKT for around 20 years on the idea of a partnership at the NBR that would be implemented in an AFA, but a mutually acceptable agreement had not been reached. As a result of failing to come to an agreement, the FWS decided to attempt to transfer the refuge in trust to the CSKT. Such a proposal, the email reads, would require Congressional approval.

44.     The FWS set meetings with Congressman Ryan Zinke, Senator Steve Daines, and Senator Jon Tester concerning the NBR proposal for the week of February 16, 2016.   On February 16, Cynthia Matrinez met with Congressmen Zinke and with Senators Daines and Tester on February 18.

45.     A February 18, 2016 email from Dan Ashe stated that he met with Department of Interior Solicitor Hilary Tompkins about drafting legislation. He stated in the email that he hoped to have a good draft by the end of the next week as he anticipated that the Montana Delegation of Zinke, Daines, and Tester might ask for assistance in drafting legislation.

46.     In a telephone conversation with retired refuge manager Ralph Webber on April 1, 2016, Dan Ashe commented that the FWS had achieved the refuge purpose of bison recovery in the NBR and could no longer afford being just "bison managers." Mr. Ashe indicated that the proposed transfer of the NBR was initiated by the FWS, but stated his opinion that the transfer was not a federal action under NEPA and that Congressional legislation was not subject to NEPA.

47.     At no point in time since discussions began about drafting legislation to transfer the NBR out of the NWRS, through Congressional briefings to the present, has the FWS contemplated or carried out any form of analysis under NEPA.

48.     To date, the FWS has yet to propose, let alone finalize, a CCP for the NBR, even though under the NWRS Improvement Act, its CCP was due in 2012 at the latest and needed to be revised every 15 years thereafter.  This law constitutes the primary mandate and guidance for administration of the NWRS.

## FIRST CAUSE OF ACTION
## DEFENDANTS HAVE VIOLATED NEPA BY FAILING TO PRODUCE AN EIS FOR A RECOMMENDATION OR REPORT ON A PROPOSAL FOR LEGLISLATION

49.     Plaintiffs hereby incorporate by reference the paragraphs set forth above as if set forth herein.

50.     The preparation of draft legislation and the meeting with Montana Congressional delegates constitutes a recommendation on a proposal for legislation under 42 U.S.C. § 4332(C). Thus, NEPA requires Defendants to prepare an EIS and Defendants violated NEPA by failing to do so.

51.      APA directs that Courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   Defendants' actions without compliance with NEPA should be held unlawful and set aside.

## SECOND CAUSE OF ACTION

## DEFENDANTS HAVE VIOLATED THE REFUGE ACT, THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT OF 1997, AND THE APA BY UNLAWFULLY WITHOLDING OR UNREASONABLY DELAYING A COMPREHENSIVE CONSERVATION PLAN FOR THE NATIONAL BISON RANGE

52.     Plaintiffs hereby incorporate the paragraphs set forth above as if set forth herein.

53.     Defendants violated § 668dd(e)(1)(A)-(B) of the Refuge Act, as amended by the NWRS Improvement Act, and its implementing regulations by failing to comply with the Refuge Act's mandatory duty to prepare a CCP for the NBR within 15 years of the enactment of the NWRS Improvement Act.

54.     The APA states that a reviewing court "shall" interpret statutes and "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). FWS's failure to issue a CCP constitutes unlawfully withheld or unreasonably delayed agency action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Defendants have violated NEPA by failing to conduct an EIS for the Agency's legislative proposal to move the NBR out of the NWRS and into a trust to be held by the United States for the benefit of CSKT.

B.     Declare that Defendants violated the Refuge Act and the National Wildlife Refuge System Improvement Act by unlawfully withholding or unreasonably delaying a CCP at the NBR.

C.     Grant preliminary and/or permanent injunctive relief preventing further actions related to submitting a draft proposal to Congress, sponsoring or promoting legislation, or advocating on behalf of the legislation, until such time as the Agency has developed an EIS to be included in its proposal to Congress as required by NEPA and CEQ regulations.

D.     Order Defendants to expeditiously prepare and complete a CCP for the NBR; thereby presenting information and data vital to management of the NBR, as well as to a reasoned decision-making process that might call for removal of a refuge from the NWRS.

E.     Award Plaintiffs their reasonable litigation expenses, including attorney fees, expert witness fees, court costs, and other expenses necessary for the preparation and litigation of this case under the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.; and

F.     Grant such additional relief as the Court deems just and proper.

Respectfully submitted this 23rd day of May, 2016.

　　　　　　　　　　　　　　　/s/　Paula Dinerstein_____

　　　　　　　　　　　　　　　Paula Dinerstein, DC Bar No. 333971
　　　　　　　　　　　　　　　Senior Counsel
　　　　　　　　　　　　　　　Public Employees for Environmental Responsibility
　　　　　　　　　　　　　　　962 Wayne Avenue, Suite 610
　　　　　　　　　　　　　　　Silver Spring, MD 20910
　　　　　　　　　　　　　　　(202) 265-7337