**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RENEAU, *et al.*,
Plaintiffs,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE, *et al.*,

Defendants.

Case No. 1:16-cv-00966-TSC

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Fed.R.Civ.P., Plaintiffs hereby move for summary judgment in this case. Plaintiffs contend that they are entitled to judgment as a matter of law on both Counts of their Complaint. A Memorandum in Support accompanies this Motion. Plaintiffs are also filing six declarations from individual Plaintiffs and a proposed order.

The parties have agreed that this case is suitable for decision on cross-motions for summary judgment based upon the administrative record submitted by Defendants. Therefore, this case is one in which judicial review is based on the administrative record, and is thus subject to amended Local Rule 7(h)(2). A statement of facts with references to the administrative record is included within the Memorandum.

For the reasons detailed in the accompanying Memorandum, Plaintiffs' Motion for Summary Judgment should be granted

March 10, 2017

Respectfully submitted,

/s/ Paula Dinerstein________

Paula Dinerstein (D.C. Bar No. 333971)
Public Employees for Environmental Responsibility (PEER)
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202-265-7337
pdinerstein@peer.org

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RENEAU, *et al*.,
Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, *et al*.,

Defendants.

Case No. 1:16-cv-00966-TSC

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Paula Dinerstein (D.C. Bar No. 333971)
Public Employees for Environmental Responsibility (PEER)
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202-265-7337
pdinerstein@peer.org

March 10, 2017

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………………………… i
TABLE OF AUTHORITIES ……………………………………………………………… ii
I. INTRODUCTION .......................................................................................................... 1
II. JURISDICTION AND STANDING .................................................................................. 2
III. STANDARD OF REVIEW ................................................................................................ 8
IV. STATUTORY AND REGULATORY BACKGROUND ...................................................... 9
A. The National Wildlife Refuge System Administration Act (Refuge Act). ........................ 9
B. The National Environmental Policy Act (NEPA) ............................................................ 11
C. Administrative Procedure Act (APA) ............................................................................. 13
V. STATEMENT OF FACTS ............................................................................................... 14
A. History and Description of the National Bison Range .................................................... 14
B. History of Annual Funding Agreements with the CSKT ................................................ 17
C. FWS Proposal to Transfer the Bison Range to the CSKT .............................................. 19
D. FWS Reconfirms its Transfer Proposal in its Notice of Intent to Draft a CCP and EIS for the Bison Range ............................................................................................................ 25
E. The CCP Process ............................................................................................................. 25
VI. ARGUMENT ................................................................................................................... 29
A. FWS is in Violation of NEPA Because it Has Failed to Prepare an EIS for its Legislative Proposal to Transfer the Bison Range to the CSKT ...................................................... 29
1. FWS has made a proposal for legislation to transfer the Bison Range to the CSKT..... 30
2. The legislative proposal significantly affects the quality of the human environment, and thus requires NEPA review. ....................................................................................... 32
3. FWS was required to transmit an EIS on its proposed transfer legislation within 30 days of its proposal. ............................................................................................................ 34
B. FWS Has Violated the Refuge Act by Failing to Complete a CCP ................................ 34
C. FWS's Notice of Intent to Prepare a CCP/EIS on its Proposal to Transfer the Bison Range to the CSKT Does Not Moot this case. ................................................................ 35
VII. CONCLUSION ............................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

**Audubon Soc'y of Portland v. Jewell*, 104 F. Supp. 3d 1099 (D. Or. 2015) .............................. 37
*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)............................................. 10
*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) ....................................................................... 39
*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982)................................................ 38
*Confederated Salish & Kootenai Tribes of Flathead Reservation v. United States*, 437 F.2d 458, 193 Ct. Cl. 801 (Ct. Cl. 1971)........................................................................................... 17
*County of Los Angeles v. Davis*, 440 U.S. 625 (1979)................................................................ 38
*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008).............................................. 9
*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) ................................................ 3
**Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) ............................. 3, 39
*Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995) ............................................... 4
**Izaak Walton League v. Marsh*, 655 F.2d 346 (D.C. Cir. 1981)................................................ 15
*Lemon v. Geren*, 514 F.3d 1312 (D.C. Cir. 2008) ......................................................................... 4
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................... 3
*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................................ 4
*Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ..................................................... 3
*Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279 (D.C. Cir. 2007)............. 8
**Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2009)..................................................... 20, 21, 35
*Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009) .......................................................... 3
*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................................... 8

* Authorities principally relied upon are denoted with an asterisk

**Statutes**

16 U.S.C. § 671 ............................................................................................................................ 15
16 U.S.C. §§ 668dd-668ee ....................................................................................................... passim
25 U.S.C. § 5301 *et. seq*. ................................................................................................................ 20
28 U.S.C. § 1331 .............................................................................................................................. 2
28 U.S.C. § 1391(e) .......................................................................................................................... 2
28 U.S.C. § 2412 *et seq*. ................................................................................................................. 41
40 C.F.R. § 1501.4 ......................................................................................................................... 35

40 C.F.R. §§ 1501.4 .......... 35

42 U.S.C. § 4332(2)(C) .......... 13

5 U.S.C. § 702 .......... 2, 15

5 U.S.C. §§ 701-706 .......... 2, 9, 10

**Other Authorities**

79 Fed. Reg. 45452 (Aug. 3, 2014) .......... 21

82 Fed. Reg. 5597-98 .......... 32

*About the Refuge*, U.S. FISH AND WILDLIFE SERV., www.fws.gov/refuge/National_Bison_Range/about.html .......... 16

BILL REFFALT ET AL., *The National Bison Range ~ From the Past, For the Future*, U.S. FISH AND WILDLIFE SERV. 2, www.fws.gov/uploadedFiles/NBR.History.update2008.pdf .......... 16, 18

Executive Order No. 3596 (December 22, 1921) .......... 16

H.R. REP. No. 105-106 (1997) .......... 10

*National Bison Range ~ Bison Conservation and Management ~ 2011*, U.S. FISH AND WILDLIFE SERV., www.fws.gov/uploadedFiles/RUbisonNote.2011.pdf .......... 18

Notice of Intent to Prepare a Comprehensive Conservation Plan for the National Bison Range, Moiese, Montana, 82 Fed. Reg. 5597 (Jan. 18, 2017) .......... 27

*Resource Management*, U.S. FISH AND WILDLIFE SERV., www.fws.gov/refuge/National_Bison_Range/what_we_do/resource_management.html .......... 16

*Visitor Activities*, U.S. FISH AND WILDLIFE SERV., www.fws.gov/refuge/National_Bison_Range/visit/visitor_activities.html. .......... 19

**Rules**

Local Rule 7(h) Comment .......... 8

**Regulations**

40 C.F.R. § 1500.1 .......... 12, 13

40 C.F.R. § 1502.16 .......... 13

40 C.F.R. § 1506.8(a) .......... 14, 32, 36

40 C.F.R. § 1508.17 .......... 14, 32, 33, 34

40 C.F.R. § 1508.7 .......... 14

50 C.F.R. § 25.11(b) .......... 11, 36

50 C.F.R. § 25.12 .......... 37

## I. INTRODUCTION

The National Bison Range (NBR or Bison Range) in Montana is one of the oldest and most popular National Wildlife Refuges in the country. Since 1908, it has played a major role in bringing the American bison back from the brink of extinction. It is now home to a herd of 350 to 400 bison and many other species of wildlife and birds, as well as rare intact native grasslands. It attracts an estimated 200,000 visitors a year from all over the United States and the world. Since 2004, the management of the Bison Range has been disrupted by several attempts to share management with the Confederated Salish and Kootenai Tribes (CSKT or Tribes). Among the consequences of repeated changes in management structure and uncertainty about the future, the U.S. Fish and Wildlife Service (FWS or Service) abandoned its efforts to complete a comprehensive conservation plan (CCP) that was required by law to be completed by 2012. In early 2016, the FWS announced that its efforts to enter another shared management arrangement with the Tribes had failed, and that it had decided to support legislation to transfer the Bison Range out of the National Wildlife Refuge System (NWRS or Refuge System) to the Tribes. FWS drafted legislation to achieve that end and advocated it to members of Congress.

Plaintiffs filed this suit in May 2016 challenging FWS's failure to complete an Environmental Impact Statement (EIS) on its legislative proposal as required by the National Environmental Policy Act (NEPA), and to complete a CCP for the Bison Range as required by the National Wildlife Refuge System Administration Act (Refuge Act). Only after this suit was filed, the CSKT drafted its own legislative proposal to transfer to the Bison Range to the Tribes, and the FWS finally reinitiated a CCP process that would include preparation of an EIS, but announced that its preferred management alternative would be legislative transfer of the Bison Range to the Tribes.

Plaintiffs are nine retired employees of the NWRS; an author with extensive publications concerning wildlife, big game hunting and the Bison Range; and a non-profit organization dedicated to advocacy on behalf of public employees and helping to hold federal agencies accountable for implementing and enforcing environmental laws. The nine Plaintiffs who worked for the NWRS held positions as managers and employees of National Wildlife Refuges and as supervisors in the regional and national offices of the Refuge System. Four of the Plaintiffs are former managers of the NBR. Their combined tenures at the NBR span 33 years. All of the Plaintiffs have continuing connections with the NBR. They seek to insure that the Bison Range wildlife and natural landscapes are properly managed, and that the Bison Range remains in the NWRS and will continue to be available to them as members of the public.

The NWRS is managed by Defendant FWS, a sub-agency of the United States Department of Interior (DOI). Defendants' challenged actions and inaction have resulted in a failure to properly manage the NBR lands and wildlife and in an ill-advised and unanalyzed proposal to divest the NBR from the NWRS altogether.

## II. JURISDICTION AND STANDING

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgment), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706. The United States has waived sovereign immunity with respect to the claims set forth herein in 5 U.S.C. § 702.

Venue is properly vested in this Court under 28 U.S.C. § 1391(e). Defendants, having authority over the actions or inactions that are the subject of this case, have offices located in this judicial district, and Plaintiff Public Employees for Environmental Responsibility (PEER) is also incorporated in this judicial district.

For the reasons set forth in the Complaint and the Declarations filed herewith, Plaintiffs have standing to bring this case. Article III standing requires a showing of: 1) injury in fact which is concrete, particularized, actual, and imminent (not conjectural or hypothetical); 2) that is fairly traceable to Defendants' actions; and 3) which is likely to be redressed by a favorable judicial decision. *E.g. Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1149 (2009); *Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000). In environmental cases, Plaintiffs meet the injury prong by showing that they have an aesthetic, recreational, or environmental interest in a particular place, animal, or plant species and that interest is impaired by defendant's conduct. *Id.* at 183; *see Nat'l Wildlife Fed. v. Burford,* 835 F.2d 305, 312 (D.C. Cir. 1987).

When dealing with procedural harm, as with challenges to the failure to prepare an EIS or a CCP, the requirements of imminence and redressability are relaxed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992); *see also Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (procedural injuries are "easily redressable, as a court may order the agency to undertake the procedure"). "Procedural injury arises where the claimant asserts a substantive injury from the denial of the statutorily required procedure." *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93, 99 (D.C. Cir. 1995). "[A plaintiff] has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (citation omitted). Thus, injury under NEPA is established if "plaintiffs suffer harm from the agency's failure to follow NEPA's procedures, compliance with which may have changed the agency's mind . . ." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).

Several of the Plaintiffs have submitted Declarations to support their standing. Plaintiff Susan Campbell Reneau is a member of PEER, and since 1977 has been an author, journalist, and magazine columnist on wildlife conservation, public lands issues, and big game hunting. Reneau Decl., Ex. 1 hereto, ¶ 3. Ms. Reneau has written books and articles about the NBR and wildlife in the NBR. *Id.* Ms. Reneau volunteers thousands of hours on various aspects of saving the NBR, hosting public hearings, submitting comments to FWS, and travelling the country to meet with groups about the NBR. *Id.*, ¶ 5. Ms. Reneau visits the NBR three or four times a year to take photographs of wildlife and to drive the dirt roads to watch wildlife. *Id.*, ¶ 6. She plans to continue to visit the NBR three or four times a year in the future. *Id.* Her aesthetic, recreational, and wildlife interests in the NBR are harmed by the Defendants' actions and inactions in this case, as the absence of a CCP results in a diminished ability of FWS to effectively manage the NBR and the NEPA violation results in a legislative proposal to remove the NBR from the NWRS entirely, without legally mandated environmental review. *Id.*, ¶ 7.

Plaintiff Robert Fields is a retired Regional Refuge Supervisor and PEER member, whose career working for the NWRS spanned from June 1958 to January 1995, a total of 37 years. Fields Decl., Ex. 2 hereto, ¶ 3. Mr. Fields served as a Refuge Manager Trainee at the National Bison Range from February 1962 to November 1963, and later managed other refuges. He ultimately retired after serving as the Regional Refuge Supervisor for California and Nevada. *Id.*, ¶¶ 3-4. In retirement, Mr. Fields volunteers with the Blue Goose Alliance and serves on the Board of Directors of the Friends of Midway Atoll, organizations that advocate on behalf of National Wildlife Refuges. *Id.*, ¶ 5. Mr. Fields last visited the NBR in 2013 and plans on visiting the NBR every three or four years, including this summer. *Id.*, ¶ 6. FWS's violation of

NEPA and its failure to draft a CCP harm Mr. Fields' aesthetic, recreational and wildlife preservation interests in a well-managed refuge in which to visit and enjoy wildlife. *Id.* at ¶ 7.

Plaintiff Joseph Mazzoni is a member of PEER and served as the Refuge Manager at the NBR from May 1965 to December 1968. Mazzoni Decl., Ex. 3 hereto, ¶ 3. Mr. Mazzoni worked for the FWS on refuges and in three different regional offices from June 1957 through January 1997, nearly 40 years. *Id.* As a former manager of the NBR and administrator in the Refuge System, FWS's violations of NEPA and the Refuge Act harm Mr. Mazzoni's interest in the NBR's maintenance of its wildlife-related recreational, educational, and scientific values. *Id.* at ¶ 5.

Plaintiff Delbert "Skip" Palmer is a member of PEER who worked at the NBR in the maintenance department for sixteen years before his retirement in 2015. Palmer Decl., Ex. 4 hereto, ¶¶ 2, 3. Mr. Palmer worked under an Intergovernmental Personnel Agreement (IPA) appointment to the CSKT during an Annual Funding Agreement (AFA) with the CSKT. *Id.,* ¶ 4. In 2007, he received an award from Rick Coleman, the Assistant Regional Director for the NWRS, for extra effort towards making the AFA work. *Id.* Mr. Palmer lives on a farm eight miles from the NBR, which he manages with his son to develop habitat for wildlife. *Id.,* ¶ 5. He regularly attends weed management meetings at the NBR and observes wildlife there almost every day. *Id.* The FWS's violations of law injure Mr. Palmer's aesthetic, recreational and wildlife preservation interests. Mr. Palmer is concerned that divestment of the NBR from the Refuge System will prevent him from observing and participating in its management, and will harm the Refuge System as a whole. *Id.* at ¶ 6.

Plaintiff Marvin Plenert is a member of PEER and a retired FWS Regional Director who has also worked in the NWRS as a field biologist, Regional Refuge Supervisor, and Deputy

Assistant Director for Refuges at the Denver Regional Office, where he oversaw all refuges in the Region including the Bison Range. Plenert Decl., Ex. 5 hereto, ¶ 3. He also served in Washington D.C. as the Assistant Director of the Refuge System and a Regional Refuge Director. Mr. Plenert retired in 1994. *Id*. Mr. Plenert visited the NBR in 2014 on a family vacation and in 2010 for the bison round-up. *Id.*, ¶ 5 Mr. Plenert plans to visit the NBR again as long as it is not transferred out of the NWRS. *Id.* FWS's violations of law harm Mr. Plenert's interest in viewing wildlife and the remnants of the original bison herds located at NBR in a natural setting. *Id.*

Plaintiff David Wiseman is a PEER member and worked in the NWRS as a Refuge Manager and Refuge Supervisor for 30 years from 1977 to 2007. Wiseman Decl., Ex. 6 hereto, ¶ 3. Mr. Wiseman worked as the Refuge Manager of the NBR from 1995 to 2004, for which he received several performance awards. *Id.* From 2004 until his retirement in 2007, Mr. Wiseman was the Refuge Supervisor in the Denver Regional Office where he was responsible for all operations several refuges and wetland management districts including the Bison Range. *Id.* Mr. Wiseman was part of the AFA negotiations with the CSKT until his retirement in 2007. *Id.* In retirement, Mr. Wiseman enjoys wildlife observation and photography in National Wildlife Refuges. *Id.*, ¶ 5. Mr. Wiseman last visited the NBR in the spring of 2015 and plans on visiting the NBR this summer and in the future. *Id.*, ¶¶ 6-7. FWS's NEPA and Refuge Act violations harm Mr. Wiseman's interest in viewing the bison in the NBR in a natural environment and his interest in the continuation of conservation efforts concerning the bison and other wildlife in the NBR. He is concerned that removing the Bison Range from the Refuge System would remove a significant portion of the DOI's bison gene pool and diminish opportunities for visitation, research and education. *Id.* at ¶ 8.

Plaintiff Public Employees for Environmental Responsibility (PEER) is a national nonprofit organization incorporated in Washington, D.C., with five field offices throughout the United States. PEER serves and protects current and former federal and state employees of land management, wildlife protection, and pollution control agencies who seek to promote an honest and open government and to help hold governmental agencies accountable for faithfully implementing and enforcing the environmental laws entrusted to them by Congress. Members of PEER, including the Plaintiffs here, retreat to the NBR to partake of its unique wildlife opportunities and have firm plans to do so again in the future.

Plaintiff Marvin Kaschke is a member of PEER and was the Refuge Manager for the Bison Range from 1968 to 1977. He was also a manager and assistant manager at other refuges before and after his time at the Bison Range. He last visited the Bison Range in 2015 and plans on visiting in the future. Complaint ¶ 10.

Plaintiff Jon Malcom was the Refuge Manager of the NBR from 1981 until his retirement in 1994. He seeks to insure that the management goals he pursued for 13 years at the Bison Range are furthered rather than undermined by a lack of planning documents or transfer out of the Refuge System. Complaint ¶ 12.

Plaintiff Don Redfearn is a retired NWRS Supervisor and refuge manager with a 31-year career in the NWRS. He has visited the NBR and plans to do so again in the future. He is a founding member and past president of the Blue Goose Alliance, which advocates on behalf of the NWRS. He is concerned that the absence of a CCP and the potential transfer of the NBR out of the Refuge System will harm his interests in effective management of the Bison Range and the System as a whole. Complaint ¶ 15.

Plaintiff William Reffalt is a retired NWRS employee and retired Director of National Wildlife Refuge Programs at the Wilderness Society. He has visited and volunteered at the NBR as recently as 2008. He hopes to visit the NBR again in the near future. Complaint ¶16.

In evaluating standing, a court must "assume that on the merits the plaintiffs would be successful in their claims." *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007) (citation omitted); *see also Defenders of Wildlife v. Gutierrez,* 532 F.3d 913, 924 (D.C. Cir. 2008) (citations omitted). Therefore, the Court must assume that Defendants have in fact violated NEPA and the Refuge Act by not preparing an EIS that would examine the environmental effects of transferring the Bison Range out of the Refuge System, and by not preparing a CCP that would fully analyze the resources and conditions of the NBR and create a management plan. The injury from these legal violations is directly traceable to Defendants' action in failing to prepare an EIS and failure to develop a CCP. That injury is redressable by this Court, which could order Defendants to develop and complete a CCP, and to take no further action to sponsor, advocate, or promote transfer legislation until they fulfill their statutory obligation under NEPA to produce an EIS concerning their legislative proposal to transfer of the NBR out of the NWRS and to the CSKT.

## III. STANDARD OF REVIEW

This is a proceeding for review of agency action and inaction based upon the administrative record. Thus, rather than determine whether there are any material facts in genuine dispute in order to grant summary judgment, the court tests the agency action against the administrative record. Local Rule 7(h) Comment.

Courts review claims based on NEPA and the Refuge Act using the standard of review established in the APA, 5 U.S.C. § 706. The APA requires that the Court "hold unlawful and set

aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2005). In a "failure to act" case such as this one, a court can "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. 706(1).

Review is based on "the full administrative record that was before the agency at the time it made its decision." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420 (1971).

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. The National Wildlife Refuge System Administration Act (Refuge Act).

The Refuge Act sets forth the guiding principles and policies for the administration and management of the NWRS by the Secretary of the DOI. National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd-668ee (2017). The original Refuge Act was enacted in 1966 and consolidated various federal authorities for managing federal land areas devoted to fish and wildlife preservation. Fish and Wildlife Conservation and Protection Act, Pub. L. No. 89-669, 80 Stat. 926 (1966). Congress amended the statute in 1976 to prohibit the transfer or other disposition of land within the Refuge System without Congressional authorization, 16 U.S.C. § 668dd(a)(6)(B), and to specify that the Refuge System was to be administered by DOI only through the FWS. Pub. L. No. 94-223, 90 Stat. 199 (1976), codified as amended at 16 U.S.C. § 668dd(a)(1).

By 1997, there were 509 refuges in the 50 states, and coupled with waterfowl production areas, the areas under FWS management totaled 93 million acres. H.R. REP. No. 105-106, at 2 (1997). In response to concerns that the variety of refuges and authorizing legislation "has led to inconsistency in the management of refuges within the System," *id*., Congress passed the National Wildlife Refuge System Improvement Act of 1997. Pub. L. No. 105-57, 111 Stat. 1252

(1997). This Act is considered to be the organic act for the NWRS. It articulates the mission of the NWRS as the administration of "a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). It requires the management of each refuge "to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A); *see also* 50 C.F.R. § 25.11(b) (2017) ("All national wildlife refuges are maintained for the primary purpose of developing a national program of wildlife and ecological conservation and rehabilitation.")

The Refuge Act requires the Secretary to prepare a CCP for each refuge or related complex of refuges that is "consistent with the provisions of this Act" and to the extent practicable, any fish and wildlife conservation plans of the State in which the refuge is located. 16 U.S.C. § 668dd(e)(1)(A)(i) and (iii). The CCP is to identify and describe: (A) the purposes of each refuge comprising the planning unit; (B) the distribution, migration patterns, and abundance of fish, wildlife, and plant populations and related habitats within the planning unit; (C) the archaeological and cultural values of the planning unit; (D) such areas within the planning unit that are suitable for use as administrative sites or visitor facilities; (E) significant problems that may adversely affect the populations and habitats of fish, wildlife, and plants within the planning unit and the actions necessary to correct or mitigate such problems; and (F) opportunities for compatible wildlife-dependent recreational uses. 16 U.S.C. § 668dd(e)(2)(A)-(F). A CCP is

> a document that describes the desired future conditions of a refuge or planning unit and provides long-range guidance and management direction to achieve the purposes of the refuge; helps fulfill the mission of the Refuge System; maintains and, where appropriate, restores the ecological integrity of each refuge and the

> Refuge System; helps achieve the goals of the National Wilderness Preservation System; and meets other mandates. 50 C.F.R. § 25.12 (2017).

Once a CCP is completed, the Secretary of Interior (as delegated to the FWS) "shall manage the refuge . . . in a manner consistent with the plan." 16 U.S.C. § 668dd(e)(1)(iv)(E).

The Refuge Act emphasizes public participation in the preparation and revision of CCPs, requiring that

> the Secretary shall develop and implement a process to ensure an opportunity for active public involvement in the preparation and revision of comprehensive conservation plans under this subsection. At a minimum, the Secretary shall require that publication of any final plan shall include a summary of the comments made by States, owners of adjacent or potentially affected land, local governments, and any other affected persons, and a statement of the disposition of concerns expressed in those comments. 16 U.S.C. § 668dd(e)(4).

Draft CCPs must be published in the Federal Register, with the opportunity for public comment. 16 U.S.C. § 668dd(e)(1)(A)(ii); (e)(4)(B).

CCPs for each refuge were to be completed within 15 years after the enactment of the National Wildlife Refuge System Improvement Act of 1997 (or by 2012), and revised every 15 years thereafter. 16 U.S.C. §668dd(e)(1)(A), (B).

### B. The National Environmental Policy Act (NEPA)

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (2017). NEPA requires all federal agencies to prepare a "detailed statement" regarding "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This "detailed statement" is commonly known as an environmental impact statement (EIS), and must fully analyze "the environmental impact of the proposed action" and its alternatives. 42 U.S.C. § 4332(2)(C).

NEPA's implementing regulations were promulgated by the Council on Environmental Quality (CEQ). These regulations provide that the NEPA process is meant to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment." 40 C.F.R. §1500.1(c). The CEQ regulation at 40 C.F.R. § 1500.1(b) provides in part that: "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA…"

As part of its duty to present a full and fair discussion of significant environmental impacts, an EIS must include consideration not only of those impacts that may be directly attributable to the proposed action, but also of indirect and cumulative impacts. 40 C.F.R. § 1502.16; *see also* §§ 1508.7-8. Indirect impacts are those caused by the action and are later in time or farther removed in distance, but that are still reasonably foreseeable. 40 C.F.R. § 1508.8. Cumulative impacts are the impacts on the environment that result from the incremental impact of an action when added to reasonably foreseeable actions, regardless of who undertakes such other actions. 40 C.F.R. § 1508.7.

The regulations require that the process for EISs on proposals for legislation "be integrated with the legislative process of the Congress." 40 C.F.R. § 1506.8(a). Legislative EISs are

> required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations. *Id.*

The definition of "legislation" for NEPA purposes states in part:

> "Legislation" includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. 40 C.F.R. § 1508.17.

The process for legislative EISs is the same as for EISs on other matters, except that there need not be a scoping process, and, with some exceptions, there need not be both a draft and a final EIS. Instead, what would ordinarily be the draft can serve as the final EIS. 40 C.F.R. § 1506.8(b). Comments on the legislative EIS and the agency's responses are to be forwarded to the Congressional committees with jurisdiction. 40 C.F.R. § 1506.8(c).

The D.C. Circuit has found that the purpose of the legislative EIS requirement is not "solely for the benefit of Congress" but also "to ensure that the public has an opportunity to participate meaningfully in decisionmaking at the administrative and legislative levels." *Izaak Walton League v. Marsh*, 655 F.2d 346, 365 (D.C. Cir. 1981) (citations omitted). Therefore, judicial review of compliance with NEPA's legislative EIS requirement is available to citizens in order to protect their right to participate in decisionmaking that affects the environment. *Id.*

**C. Administrative Procedure Act (APA)**

The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702 (2017). Under the APA, courts "shall compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action" includes a "failure to act." 5 U.S.C. §551(13).

## V. STATEMENT OF FACTS

### A. History and Description of the National Bison Range

The NBR is located in Moiese, Montana, in the Flathead Valley, 48 miles north of the city of Missoula. FWS 000130.[1] It was established over 100 years ago by an Act of Congress signed by Theodore Roosevelt in 1908. That Act directed the President to reserve up to 12,800 acres of unallotted lands within the boundary of the Flathead Indian Reservation for "a permanent national bison range for the herd of bison to be presented by the American Bison Society." 16 U.S.C. § 671 (2017); *see also* 35 Stat. 267-68 (1908) (appropriating funds to pay tribes the appraised value of such lands). The following year, the Bison Range was enlarged to up to 20,000 acres. 35 Stat. 1051 (March 4, 1909); s*ee* FWS 000036, 000040. Lands comprising 18,521 acres were approved by the President to be reserved for the National Bison Range in 1909, with subsequent minor adjustments in acreage. FWS 000040.

This was the first time that Congress had appropriated money to purchase land for wildlife conservation.[2] By the late 1800s, the 30 to 60 million bison that had formerly roamed the North American continent had been reduced to 100 animals in the wild. The Bison Range was established to assure the preservation of the species.[3]

A 1921 Executive Order provided additional protection the area, by establishing the Bison Range as a refuge and breeding ground for birds. Executive Order No. 3596 (December 22, 1921), FWS 000097. In 1958, the Secretary of Interior was authorized to acquire up to 40

---

[1] Citations to the administrative record will be to the Bates numbering of the record.

[2] BILL REFFALT ET AL., *The National Bison Range ~ From the Past, For the Future*, U.S. FISH AND WILDLIFE SERV. 2, https://www.fws.gov/uploadedFiles/NBR.History.update2008.pdf at 1 (last visited March 7, 2017).

[3] *About the Refuge*, U.S. FISH AND WILDLIFE SERV., https://www.fws.gov/refuge/National_Bison_Range/about.html (last visited Mar. 7, 2017).

acres of additional land for a pasture for a display of the bison in their natural habitat. Montana National Bison Range, Pub. L. No. 85-622, 72 Stat. 561 (1958). The Bison Range now encompasses 18,766 acres.[4]

In 1971, the U.S. Court of Claims awarded the Confederated Salish and Kootenai Tribes of the Flathead Reservation compensation for lands that had been taken from their reservation by the United States for the Bison Range, as well as for lands taken to open to settlement and for other purposes. The court found that although the Tribes had previously received payment for the land that became the Bison Range, that payment was less than the fair market value of the land at the time it was taken from the Tribes. Therefore, the Tribes were awarded the difference between the fair market value and what they had already received. *Confederated Salish & Kootenai Tribes of Flathead Reservation v. United States*, 437 F.2d 458, 193 Ct. Cl. 801 (Ct. Cl. 1971).

According to the NBR website,

> Today, the National Bison Range is a diverse ecosystem of grasslands, Douglas fir and ponderosa pine forests, riparian areas and ponds. The Range is one of the last intact publicly-owned intermountain native grasslands in the U.S. In addition to herds of bison, it supports populations of Rocky Mountain elk, mule deer, white-tailed deer, pronghorn, and bighorn sheep as well as coyotes, mountain lions, bears, bobcat and over 200 species of birds.[5]

The NBR is now home to 350 to 500 bison.[6] The bison are carefully managed to "conserve bison genetic diversity, maintain herd health and provide public opportunity to view

---

[4] *Resource Management*, U.S. FISH AND WILDLIFE SERV., https://www.fws.gov/refuge/National_Bison_Range/what_we_do/resource_management.html (last visited Mar. 7, 2017)).

[5] *Id.*

[6] U.S. FISH AND WILDLIFE SERV., *supra* note 3.

bison in a natural prairie setting."[7] When the number of bison at the NBR exceeds its carrying capacity, excess bison are sold or donated to provide a gene pool and breeding stock to start or augment other herds.[8] The NBR herd continues to play an important role in the recovery of the species.[9] This is because the NBR herds "have a high level of genetic diversity, with one of the highest levels of allelic richness, heterozygosity, and private alleles of the federal herds tested. NBR bison also have a very low level of cattle allele introgression."[10] The 50 to 95 bison removed from the NBR each year are offered first to other FWS herds for genetic conservation purposes. The remainder are donated to Native American Tribes or research programs, or sold to private individuals.[11]

DOI has a "Bison Conservation Initiative," which aims to coordinate the management of bison on federal, state, tribal and private lands, including the Bison Range. FWS 00753-763. As of 2008, there were bison populations under DOI jurisdiction in seven National Wildlife Refuges and five National Parks. FWS 000756. As of February 2016, there were bison herds at seven National Wildlife Refuges (including the Bison Range), nine National Parks, and two Bureau of Land Management sites. FWS 001058.

DOI manages bison as metapopulations (groups of spatially separated populations of the same species that can exchange animals), to take advantage of a larger number of animals to further the genetic diversity and viability of the species. FWS 00761-62. DOI notes that the

---

[7] *National Bison Range ~ Bison Conservation and Management ~ 2011*, U.S. FISH AND WILDLIFE SERV., https://www.fws.gov/uploadedFiles/RUbisonNote.2011.pdf (last visited Mar. 7, 2017).

[8] BILL REFFALT ET AL., *supra* note 2, at 3.

[9] *Id.*

[10] U.S. FISH AND WILDLIFE SERV., *supra* note 7.

[11] *Id.*

FWS herds have individually identified animals, which enables conservation of unique and rare genetic characteristics through metapopulation management, including the establishment of three satellite herds to the NBR herd. FWS 000759. Where, as in the case of the Bison Range, the land cannot support herds of 1,000 or more, satellite herds should be created when possible to increase the metapopulation size. FWS 00761.

The NBR has a Visitor Center that hosts up to 1,000 people a day in the summer. FWS 000007. Public use facilities also include scenic drives, hiking trails and fishing areas.[12] The NBR accommodates numerous school groups, FWS 000008, and has an annual bison round-up attended by thousands. FWS 000009. As of 2014, FWS estimated that the Bison Range drew "over 200,000 annual visitors from all over the world to view and photograph wildlife. Visitors come to explore the visitor center, drive the 19-mile-long Red Sleep Auto Tour Route, fish and hunt, and participate in refuge complex education and interpretation programs." National Bison Range Complex Environmental Assessment, 79 Fed. Reg. 45452, 45453 (Aug. 5, 2014).

### B. History of Annual Funding Agreements with the CSKT

The history of the previous Annual Funding Agreements (AFAs) with the CSKT is set out in the decision in the previous litigation concerning the management of the Bison Range. *Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2009). The Indian Self-Determination Education & Assistance Act (ISDEAA), 25 U.S.C. § 5301 *et. seq.*, authorizes the Secretary of the Interior to enter into contracts with Indian tribes to have them perform programs, functions, services, or activities, including administrative functions, that would otherwise be performed by DOI for the benefit of Indians. In 1994, Congress passed the Tribal Self-Governance Act, which amended the ISDEAA and authorized the Secretary to enter into AFAs to transfer control of programs,

[12] *Visitor Activities*, U.S. FISH AND WILDLIFE SERV., https://www.fws.gov/refuge/National_Bison_Range/visit/visitor_activities.html (last visited Mar. 7, 2017).

services, functions, and activities that are of special geographic, historical, or cultural significance to the participating tribe. However, such programs, functions and activities may not include any that are "inherently federal." 744 F. Supp. at 101-02.

In 2004, DOI and the CSKT entered an AFA concerning operation and management of the Bison Range for Fiscal Years (FY) 2005 and 2006 (2005 AFA). It became effective March 15, 2005. *Id.* at 105. Pursuant to the 2005 AFA, the Tribe performed activities in the areas of Management, Biological Program (including habitat management), Fire Program, Maintenance Program, and Visitor Services, under the supervision of the FWS Refuge Manager. *Id.* On December 11, 2006, the FWS formally notified the CSKT that it was withdrawing the CSKT's authority to operate under the 2005 AFA and terminating negotiations for an FY 2007 AFA. The reasons given were the CSKT's poor performance of its functions under the 2005 AFA and "the unacceptable workplace environment at the NBRC and unsafe conditions for employees and the public." *Id.* at 106. The CSKT disputed FWS's conclusions and appealed the termination of the AFA to the Board of Indian Appeals. *Id.* at 107.

That appeal was never resolved, but in 2007, the DOI began negotiations with the CSKT for a new AFA, eventually resulting in an FY 2009-2011 AFA that became effective January 1, 2009 and was set to expire on September 30, 2011. *Id.* However, on September 28, 2010, Judge Kollar-Kotelly of the U.S. District Court for the District of Columbia set aside that AFA for failure to comply with NEPA. *Id.* at 120. The court concluded that DOI had improperly relied on a categorical exclusion from NEPA instead of doing an environmental assessment (EA) or EIS. *Id.* at 115-18. The court found, "The agency's failure to explain its application of a categorical exclusion, in light of substantial evidence in the record of past performance problems

by the CSKT [which could cause significant impacts on the environment], is arbitrary and capricious." *Id.* at 118.

Nearly two years after the court cancelled the second AFA, DOI (through FWS) and the CSKT completed yet another draft AFA for FY 2013-2016. In May 2012, the FWS posted on the Bison Range web site this draft of a third AFA, along with a notice that it would prepare an EA for the new AFA and a request for scoping comments on the EA. National Bison Range Complex Environmental Assessment, 79 Fed. Reg. 45452, 45453 (Aug. 3, 2014). Two years later, in August 2014, FWS released a draft EA for the proposed third AFA and requested comments. *Id.* at 45452-53.[13]

**C. FWS Proposal to Transfer the Bison Range to the CSKT**

The FWS received numerous comments on the draft EA, but never finalized it or the proposed third AFA. Instead, on February 5, 2016, messages were sent to NWRS and FWS Regional staff by Cynthia Martinez, Chief of the NWRS, and Noreen Walsh, FWS Regional Director for the Mountain-Prairie Region. Both messages explained that because the efforts to agree upon a new AFA had failed, the FWS had now decided to propose legislation to transfer the Bison Range to the CSKT. The messages made clear that this proposal had originated with FWS and that the CSKT had only been informed about it that same day. The message from Regional Director Walsh explained that efforts to form a partnership with the CSKT on the Bison Range through an AFA had been unsuccessful, as "the parties have been unable to come to terms on a mutually-acceptable agreement." She stated that discussions with the CSKT had begun that day about FWS supporting legislation that would transfer the Bison Range to the

[13] *Draft Environmental Assessment for a Draft Annual Funding Agreement: National Bison Range Complex, Montana*, U.S. FISH AND WILDLIFE SERV., https://www.fws.gov/bisonrange/AFA-2014/draft_nbr_ea_afa.pdf (last visited Mar. 7, 2017).

CSKT, noting, "[t]oday was our first discussion with the CSKT about the idea." FWS 001058. The message from Refuge Chief Martinez also noted that the process of negotiating and implementing AFAs had not been effective, and stated that discussions with the CSKT about the transfer had begun that day. FWS 001040.

Although the announcement to the CSKT and to FWS staff of the plan to support transfer legislation occurred on February 5, 2016, the drafting of transfer legislation and the formulation of plans to promote it had occurred earlier. DOI work on drafting legislation began at least as early as November 2015. On November 16, 2015, Dan Ashe, then the Director of the FWS, communicated with Kevin Washburn, Assistant Secretary for the Bureau of Indian Affairs, about the planned legislation. Mr. Washburn told Mr. Ashe: "we also think that legislation will be necessary," and offered to help with drafting it. FWS 00950-51. On November 20, 2015, Director Ashe sent Jim Kurth, FWS Deputy Director of Operations, a document that Defendants characterized in the draft administrative record as "draft received from solicitor," with an attachment described as "draft legislation with solicitor comments." Draft Administrative Record No. 20151120 1847. A January 26, 2016 email from Director Ashe to NWRS officials states, "this is the latest draft of the legislation that I have," and attaches a "Bison Range draft" dated January 5, 2016. FWS 001720. (The November 20, 2015 and January 5, 2016 drafts themselves were withheld from the administrative record as purportedly privileged.)

The FWS continued to create and discuss revised drafts of the transfer legislation after the February 5, 2016 announcement. A February 19-22, 2016 redacted email string, FWS 001725, contains a discussion between Barry Roth, DOI Associate Solicitor; Dan Ashe, FWS Director; Maureen Walsh, Regional Director, and Cynthia Martinez, National Refuge System Director, about an attached February 18, 2016 revised draft of the legislation (which was also

withheld from the record as purportedly privileged). A February 26, 2016 draft of the legislation was included in the administrative record, FWS 001712-14, because it was sent to Brian Upton of the CSKT (on February 29, 2016) and therefore could not be withheld as a deliberative. The draft bill states that its purpose is "To transfer the lands comprising the National Bison Range unit of the National Wildlife Refuge System to the Confederated Salish and Kootenai Tribes of the Flathead Reservation, to be held in trust by the Secretary of Interior for the benefit of the Confederated Salish and Kootenai Tribes." FWS 001713. In addition to the land itself, the draft legislation transfers "to the Tribes to own in fee the United States' interests in and ownership of, all buildings, structure, improvements and appurtenances located on the lands transferred pursuant to this section." The legislation would also transfer to the Tribes the bison herd and personal property on the site. FWS 001713-14, Sec. 3(b).

Despite the fact that DOI had already been working on draft legislation for months, in a February 28, 2016 communication with Tribal officials, Director Ashe reported, "the DOI Solicitor (Hillary Tompkins) is ready to begin work to draft legislation. . . . I hope we can have a good draft by the end of next week, as I'm anticipating that the delegation may ask us for assistance in drafting legislation." FWS 001127; *see also* FWS 001019 (January 28, 2016 Communications Strategy document stating: "We are early in this process, but the Service expects to play a significant role in the drafting of legislation for the transfer of this land"); *see also* FWS 001048; FWS 001082.

Even before the public announcement of the legislative transfer proposal, FWS was looking for a sponsor for legislation. A January 28, 2016 Communication Strategy document asks, "Who would sponsor legislation (Tester)?" FWS 0001012. FWS in fact submitted draft legislation to Senator Jon Tester of Montana. An undated 2016 document states that the

language DOI drafted for Senator Tester had been reviewed by the DOI Solicitor's Office and would transfer the lands comprising the Bison Range from the Refuge System to be held in trust for the CSKT to be "part of the Flathead Indian Reservation." FWS 000997. It further states that once the internal review process was complete, the draft legislation would be transmitted to Senator Tester's office. *Id.* A March 14-15, 2016 email chain also shows FWS responding to a Request for Technical Drafting Assistance. FWS 001707-11. In that exchange, DOI was in the process of providing the February 26, 2016 draft legislation (described above) to Senator Tester. FWS 001415–16. On April 8, 2016, DOI submitted another version of its draft bill to Senator Tester. FWS 002003-2005.

FWS officials also contacted and met with members of Congress and their staffs to advocate for the legislation. Before FWS's February 5, 2016 announcement of the transfer proposal, FWS staff were planning their roll out of the proposal, which included calls and meetings with members of Congress to promote the proposal. A January 3, 2016 Communications Strategy document includes plans for calls from FWS Headquarters to the Montana congressional delegation in Washington D.C. and to their staff in Montana immediately following the planned meeting with the CSKT to make the proposal to the Tribe. FWS 001000-1001; s*ee also* FWS 001013 (Jan. 28, 2016 communications plan for congressional outreach on February 5, 2016, including the FWS Director calling Senator Tester and Senator Steve Daines and other potential bill sponsors, both before and after the meeting with the CSKT); FWS 001042 (Feb. 5, 2016 version of communications strategy stating that after the meeting with the CSKT, Headquarters-CLA will call the Montana delegation "to discuss the meeting and associated proposal. CLA will let them know that Director Ashe is happy to schedule a call to discuss further"); FWS 001044 (plan was to contact Montana's governor, two senators, House

member, and local staffers). In a February 26, 2016 email to Brian Upton, CSKT counsel, Ms. Martinez, the Refuge Chief, shares that she sent an email about FWS's transfer proposal to six individuals (presumably staff) in the House of Representatives. FWS 001143.

After the February 5, 2016 announcement, Cynthia Martinez, the Refuge System Chief, met with the congressional offices of all of the Montana delegation and the House Natural Resources Committee concerning the transfer proposal. FWS 001085; FWS 001094. Meetings were scheduled for Ms. Martinez with Congressman Ryan Zinke on February 16, 2016, and with Senators Daines and Tester on February 18, 2016. FWS 001126. On February 18, 2016, Director Ashe told CSKT officials, "Our National Wildlife Refuge System Chief, Cynthia Martinez, has been meeting with the Montana delegation staff, and as you described from your visits, she is getting supportive responses." FWS 001127.

As detailed above, the transfer legislation proposal originated from the FWS and legislation had been drafted well before the CSKT was informed of the proposal. Legislation was drafted as early as November 2015, but the February 5, 2016 announcements of the proposal recited that the CSKT had just been informed of the proposal that day. These facts are further confirmed by several additional record documents. The record shows that Mr. Upton, the tribal attorney, was sent the February 26, 2016 draft of transfer legislation on February 29, 2016, well after FWS's public announcement of the proposal. FWS 001712-14. There is no indication in the record that CSKT officials were ever sent, or even informed of, the earlier November 2015 and January 2016 versions of the legislation. A January 28, 2016 internal planning document indicates that FWS did not yet know what the CKST's reaction to the proposal would be: "We are assuming that the CSKT will agree with the proposal with caveats. May need council approval." FWS 001012. FWS also recounted how the decision to propose transfer was made

by FWS itself after discussions by "leadership in the Director's Office, the Refuges Program HQ, and in our Region." FWS 001018; *see also* FWS 001046. A February 17, 2016 email from Tribal Chairman Vernon Finley to Director Ashe recounts his excitement at recently learning of the FWS proposal, and states, "I shared the meeting as well as the emails that went out to FWS staff with the rest of tribal council and they were all ecstatic as well." FWS 001128. Also on February 17, 2016, Mr. Upton wrote to Anna Munoz at FWS saying that he had spoken with CSKT Chairman Finley and wanted to confirm the tribal council's support for the transfer proposal. FWS 001701-02. In the many months in which FWS crafted and cultivated support for its proposed transfer legislation, it performed no NEPA analysis.

In June 2016, well after all of these activities regarding the transfer legislation FWS proposed and drafted, and after this suit was filed, the CSKT drafted its own version of transfer legislation. FWS 001469-70; FWS 001567, FWS 001568. CSKT's draft bill dated June 6, 2016, has the nearly same title as the FWS February 26, 2016 draft that is in the administrative record, the "National Bison Range Transfer Act of 2016." The CSKT title is the "National Bison Range Transfer and Restoration Act of 2016." Although the CSKT draft elaborates and expands upon the language of the FWS draft, it performs the same basic function of transferring the land, buildings, and the bison herd of the Bison Range to the CSKT.[14] The language of several provisions is identical or nearly identical to the FWS draft.[15] After receiving public comments on

[14] *Compare* FWS 001713-14, §§ 3(a) and 3(b) *with* CSKT draft, §§ 4(a), 4(b) and 4(c), available at http://bisonrangeworkinggroup.org/wp-content/uploads/2016/06/CSKT-Draft-NBR-Bill-6-6-16.pdf

[15] *Compare* FWS § 3(b) *with* CSKT draft § 4(b); FWS § 2(a) *with* CSKT draft § 3(a)(1); FWS § 2(c) *with* CSKT draft § 3(a)(10), FWS § 2(d) *with* CSKT draft § 3(a)(11); FWS § 2(e) *with* CSKT draft § 3(a)(16).

this draft, the Tribe posted a revised draft dated September 13, 2016 that again added language but kept the same basic purpose of transferring the land, buildings and bison herd to the Tribes.[16]

**D. FWS Reconfirms its Transfer Proposal in its Notice of Intent to Draft a CCP and EIS for the Bison Range**

On January 18, 2017, FWS reconfirmed its continuing support for its legislative proposal to transfer the Bison Range to the CSKT. Notice of Intent to Prepare a Comprehensive Conservation Plan for the National Bison Range, Moiese, Montana, 82 Fed. Reg. 5597 (Jan. 18, 2017). In that Notice, the Service stated its intent to begin to develop a CCP for the NBR that would have as its "Preferred Management Option" "Congressional transfer of the lands comprising the NBR unit of the National Wildlife Refuge System to the CSKT of the Flathead Reservation, to be held in trust by the Secretary of the Interior for the benefit of the CSKT." 82 Fed. Reg. 5598. The FWS also announced its intention to prepare an EIS on this CCP. *Id.*

**E. The CCP Process**

As set out above, the requirement for CCPs was instituted in the National Wildlife Refuge System Improvement Act of 1997, and required all refuges in the NWRS to complete CCPs within 15 years of its enactment, or by 2012. 16 U.S.C. § 668dd(e)(1)(A)(iv)(B). Planning for a CCP for the Bison Range Complex began in 1996. FWS 000237-247. A January 13, 1997 proposed schedule for the CCP listed preplanning in July-December 1996. It listed tasks including consultations with interested parties, open houses, drafting, and receiving and reviewing comments, and projected that the process would culminate in final adoption of the CCP in October 1999. FWS 000256-57. Planning was actually initiated in July 1996, and staff had completed pre-planning by January 15, 1997. Consultation with the CSKT, local

[16] Revised CSKT draft, available at http://bisonrangeworkinggroup.org/wp-content/uploads/2016/09/Revd-Drft-Bison-Range-Restoration-Act-9-13-16.pdf

governments and federal and state agencies was planned for January 1997, similar meetings with local interest groups for February 1997, and public open houses for April and May 1997. FWS 000270; FWS 000272; FWS 000274; FWS 000298. By October 1997, the process was still underway, but the projection for completion of the CCP had slipped slightly, to December 1999. FWS 000279. FWS staff created outlines for the CCP. FWS 000290-96.

On December 8, 1997, a Notice of Intent to prepare a CCP was published in the Federal Register, noting that CCP planning had begun, and soliciting comments on several questions concerning the Bison Range Complex and the CCP. FWS 000323-24. Additional open houses were held in January 1998, attended by over 100 people, and comment forms were more widely distributed. The results from all of these activities were analyzed in a scoping report. FWS 000334-51.

A planning consultant hired to assist with the CCP prepared a report in July 1998. FWS 000353-360. Staff held planning meetings. FWS 000361-388. In November 1998, staff involved in CCP planning held weekly meetings "to help keep everyone on track for reviewing, writing or summarizing information," and staff were instructed to treat the CCP as a priority. FWS 000396. Work on the CCP continued for the next year. However, after December 1999, FWS 000443-44, all work on the CCP appears to have ceased.

The fact that no work on the CCP was done between 1999 and at least 2008 is confirmed in a January 2008 communication from FWS Region 6 Refuge Supervisor Dean Rundle to Brian Upton with the CSKT, stating that no funds had been allocated or spent on preparation of a CCP for the Bison Range for the last ten years. FWS 000751. Mr. Rundle said that FWS planned to initiate a CCP in FY 2010, "and [we] look forward to working with the CSKT on that effort." *Id.*

Although no work on the Bison Range CCP was occurring, the FWS nevertheless repeatedly listed ever-receding projected dates to commence work on the CCP (while not acknowledging the earlier efforts between 1996 and 1999). The 2003 Proposed CCP Schedules for Region 6 of the FWS lists the Bison Range CCP as scheduled to begin in FY 2004. FWS 000553; FWS 000561. In 2004, the scheduled initiation of the Bison Range CCP was moved to FY 2005. FWS 000575. In 2005, it was moved to FY 2009, FWS 000591, to FY 2012, FWS 000595; FWS 000597; FWS 000599, and to FY 2013. FWS 000601. In 2006, the projected date for initiating the Bison Range CCP was listed as FY 2010, FWS 000603, where it remained in 2007. FWS 000610; FWS 000748. While the 2008 and 2009 CCP schedules continued to list initiation of the Bison Range CCP in FY 2010, FWS 000765; FWS 000767, the Bison Range disappeared from the schedule altogether in March 2010. FWS 000782. Later in 2010, it reappeared as scheduled to begin in FY 2011. FWS 000792; FWS 000801.

Several documents in the record make clear that the reason for theses repeated postponements, even beyond the statutory 2012 deadline, was that FWS did not want to commence the CCP process until another AFA was in place. In January 2008, the DOI Assistant Secretary for Fish, Wildlife, and Parks wrote in a letter that the lack of resolution concerning the AFA with the CSKT was "distracting us from fulfilling our mission at the NBRC including the completion of Comprehensive Conservation Plan (CCP) for the NBR, Pablo and Ninepipes NWRs." FWS 000749. A 2011 document concerning CCP planning recites that while the Bison Range CCP was scheduled to begin in October 2010, the 2010 court ruling setting aside the second AFA "prompted the Region to postpone development of its comprehensive management plan until litigation is settled and an environmental assessment can be completed on the management actions. We expect to begin this CCP in early 2013." FWS 000806. In early 2012,

the Bison Range CCP process was listed as beginning in FY 2013, FWS 000822; FWS 000828. However, a November 28, 2012 memo concerning CCPs states that the Bison Range CCP would not be started until "shortly after the next AFA is negotiated and NEPA is complete on the decision." FWS 000831. Of course, there never was a next AFA or a completed environmental assessment.

The last document in the record that lists a proposed time for the Bison Range AFA is a 2014 list of CCPs that had not been completed. FWS 000927-28. It notes that 90% of refuges had completed CCPs, and projected completion of the Bison Range CCP in FY 2019.

In November 2015, the FWS received contractor proposals to assist in developing a CCP and EA, likely with an AFA with the CSKT in mind. The possibility of a transfer to the CSKT is not mentioned in these proposals, but they assume that the FWS and the Tribe will be working together on the CCP and EA. The scope of work for the first proposal describes a plan to have the FWS and the CSKT work together as a "core planning team." The Tribe and FWS would participate in an "internal scoping process" leading to a vision and issues document, before any outside agencies or the public were involved. FWS 000932-38. The period of performance of the contract was to be March 2016 to September 30, 2019. FWS 000937. A similar December 2015 proposal to facilitate workshops for the CCP, FWS 000952-968, noted that the project includes "a cadre of qualified facilitators" in recognition of the "sensitivity of past and current relationship [sic] between the Service and its tribal partners." FWS 000955. A third proposal for facilitation assistance in the preparation of the CCP and NEPA documentation also assumed that the Tribe and FWS would be working together. It stated that it was directed at "teaching Service and Tribal staff how to conduct their own NEPA process and complete an

adequate NEPA document," FWS 000975, and would emphasize "team building and conflict resolution." FWS 000976.

These proposed contracts do not appear from the record to have been entered. In fact, the process appears to have been abandoned, likely when the decision was made to propose a transfer of the Bison Range rather than continue to pursue another AFA. Confirming this change in direction, a February 2016 list of "CCPs Not Completed," FWS 001021, lists the NBR expected completion date as "Unknown pending Bison Range transfer." FWS 001022.

There is no further discussion of the CCP in the administrative record, and it was only in January 2017, well after this lawsuit was filed, that the FWS published a Notice of Intent to begin work on a CCP which will propose congressional transfer to the CSKT as the preferred management option. 82 Fed. Reg. 5597-98.

## VI. ARGUMENT

### A. FWS is in Violation of NEPA Because it has Failed to Prepare an EIS for its Legislative Proposal to Transfer the Bison Range to the CSKT

NEPA requires an EIS for "every recommendation or report on proposals for legislation" . . . significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Per the CEQ regulations, '"legislation' includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency," meaning that the "proposal is in fact predominantly that of the agency rather than another source." 40 C.F.R. § 1508.17. The timing for producing a legislative EIS is so that it can "be integrated with the legislative process of the Congress." 40 CFR § 1506.8(a). It must be part of the transmittal of the legislative proposal to Congress, but may be transmitted to Congress up to 30 days after the proposal. *Id.*

FWS transmitted its legislative proposal to Congress a year ago, in February, March and April of 2016. There is no dispute that FWS has not completed an EIS on its legislative proposal or submitted an EIS to Congress. Its stated intention to perform an EIS on the CCP it has now initiated, whose preferred management alternative is legislative transfer to the CSKT, is certainly not a transmittal of a completed EIS to Congress, but it is an implicit admission that an EIS is required.

*1. FWS has made a proposal for legislation to transfer the Bison Range to the CSKT.*

As the recitation of the facts above illustrates, FWS made a proposal for legislation to transfer the Bison Range to Congress beginning in February 2016, including submitting draft bills to Congress and visiting congressional offices to promote the legislation. *See* Sec. V.C, above. Despite the clarity of these facts in the administrative record, Plaintiffs anticipate that Defendants may argue, as they claimed in their Answer to the Complaint, that FWS has not made a proposal for legislation but has only supported the CSKT's proposal for legislation. Answer, ECF No. 14, ¶¶ 1, 46.

The problem with this claim is that the FWS conceived the idea for legislation transferring the Bison Range to the CSKT and actually drafted legislation to do so before the CSKT even knew about the proposal. The FWS presented the proposal to the CSKT, which the CSKT then embraced -- not the other way around. FWS 00950-51; FWS 001720; F2s 001012; FWS 000917; FWS 001707-11; FWS 001000-1001; FWS 001042; FWS 001044; FWS 001018; FWS 001701-02. The FWS supplied the CSKT with <u>its</u> draft of the legislation in February 2016. FWS 001712-1714. It was not until June 2016 that the CSKT produced its own draft of transfer legislation, which closely tracked the FWS's draft. *See* pp. 24-25 above and nn. 14-16; FWS 001561; FWS 001568; FWS 002003-2005.

Before the CSKT's draft legislation existed, in February through April 2016, the FWS presented its draft legislation to Senator Tester and met with congressional offices to advocate its legislative proposal. FWS 00097; FWS 001707-11; FWS 002003-2005; FWS 001000-1001; FWS 001013; FWS 001042; FWS 001044; FWS 001143; FWS 001126; FWS 001127. Thus, clearly the legislative proposal requires an EIS because it is "predominantly that of the agency rather than another source." 40 C.F.R. § 1508.17.

Defendants may also argue that they have somehow withdrawn their earlier proposal for legislation in favor of the CSKT's proposal and therefore it is no longer a federal agency proposal requiring an EIS. However, nothing in the record indicates any such withdrawal, and the January 2017 Notice of Intent indicates the opposite – that FWS is still supporting legislation to transfer the Bison Range to the CSKT. Moreover, even if the FWS is now supporting the CSKT's draft version of the legislation, that draft is derivative of the FWS's earlier proposal and drafts, and does not change the reality that the "proposal is in fact predominantly that of the agency rather than another source." 40 C.F.R. § 1508.17. Merely interposing another draft of legislation with the same objective cannot take the proposal out of being "developed by or with the significant cooperation and support of a Federal agency." *Id.* It therefore requires a legislative EIS.

If Defendants wish to avoid the EIS requirement, they must truly end their association with and support of the legislative proposal to transfer the Bison Range. This would mean withdrawing the Notice of Intent to prepare a CCP that advances congressional transfer as the preferred management alternative, and informing the Congress that DOI is no longer proposing or supporting legislation to transfer the Bison Range to the CSKT. An attempted sleight of hand

to transfer the proposal from the FWS to the CSKT cannot be effective to evade NEPA as long as FWS remains on record proposing and supporting transfer legislation that it originated.

*2. The legislative proposal significantly affects the quality of the human environment, and thus requires NEPA review.*

To be subject to the legislative EIS requirement, the proposed legislation must "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). If the action is not subject to a categorical exclusion, but there is a question as to whether the environmental effects will be significant, the agency must prepare an environmental assessment (EA) to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4; 1508.9. If the agency determines based on the EA not to prepare an EIS, it must prepare a "finding of no significant impact" (FONSI) and make it available to the public. 40 C.F.R. § 1501.4(e); 1508.13. Thus, agencies must complete some NEPA analysis, either an EA accompanied by a FONSI or an EIS, for any federal action not categorically excluded from NEPA.

In the prior litigation, the court rejected Defendants' argument that an AFA with the CSKT could be subject to a categorical exclusion. The court pointed out that NEPA requires agencies to consider environmental impacts even if they are not entirely certain. *Reed v. Salazar*, 744 F. Supp. 2d at 118. Therefore, even though it was not certain that the poor performance that caused FWS to terminate the 2005 AFA would be repeated (or even that FWS was accurate in finding poor performance), those earlier findings precluded a categorical exclusion. *Id.* The FWS had previously found that the CSKT's performance was inadequate on tasks "that influence wildlife health and safety, habitat management and the long-term maintenance of vehicles, equipment and infrastructure, interior fence maintenance, and bison husbandry," *id.* at 117, matters which would clearly have significant environmental effects.

The need for NEPA review would apply with even more force to the current proposal to completely transfer management authority to the CSKT and transfer the NBR out of the Refuge System. Not only would there be the potential for environmental effects from Tribal management – this time without any FWS oversight – but there would be effects from transferring the NBR out of the Refuge System, which is intended to function as a coordinated whole. 16 U.S.C. §§ 668dd(a)(2); 668dd(a)(3)(A); 50 C.F.R. § 25.11(b). Regardless of how the CSKT might manage the Bison Range if it is transferred, it would not be part of the Refuge System and would not be managed in coordination with the other refuges in the System.

There would also be significant environmental impacts as a result of taking the Bison Range out of DOI's metapopulation management of its bison herds. *See* Sec. V.A, above; FWS 00753-63. FWS put on hold bison transfers normally used to improve the genetic diversity of the metapopulation because of the potential transfer to the CSKT. FWS 001492; *see also* FWS 001049 (recognizing that the program to spread the genetic stock of the Bison Range herd to other locations where FWS would still have access for conservation purposes would need to be addressed in the transition to CSKT management). Even the most basic attributes of a National Wildlife Refuge could change: FWS has admitted that if the Bison Range were transferred to the CSKT, the Tribes would have full management authority and might not allow public visitation. FWS 001020, FWS 001048, FWS 001082.

Thus, an EIS, or at the least an EA, on the legislative transfer proposal would be legally required. Defendants appear to agree with this, since they were in the process of completing an EA on the proposed third AFA, and their January 2017 Notice of Intent includes a plan to prepare an EIS on the CCP that has legislative transfer as its preferred management option.

*3. FWS was required to transmit an EIS on its proposed transfer legislation within 30 days of its proposal.*

The CEQ regulations require that a legislative EIS be transmitted to Congress at the latest 30 days after the proposal is made to Congress. 40 CFR § 1506.8(a). The proposal here was made to Congress repeatedly between February and April 2016. FWS did not transmit an EIS within 30 days of these dates, and therefore is in violation of NEPA.

**B. FWS Has Violated the Refuge Act by Failing to Complete a CCP**

Defendants do not dispute that they have not completed a CCP for the Bison Range, which was required by the Refuge Act to be completed by 2012. Answer to Complaint, ECF No. 14, ¶ 48 (admitting the NBR does not have a CCP). The 2012 deadline to complete CCPs is "a mandatory and non-discretionary deadline." *Audubon Soc'y of Portland v. Jewell,* 104 F. Supp. 3d 1099, 1102 (D. Or. 2015). When it is violated, "the task for the Court is not to determine *whether* an injunction should issue, but what the timeline on that injunction should be." *Id.*

The failure to develop and complete a CCP has deprived Plaintiffs and other members of the public of the opportunity to participate in planning for the management of the NBR that the Refuge Act requires. 16 U.S.C. § 668dd(e)(4)(A) and (B). A mere proposal to initiate a CCP process, as FWS announced in January 2017, is not a completed CCP, and Defendants remain in violation of the law. In addition, the proposed CCP is not a valid CCP at all, and therefore means nothing in the context of this case. A CCP is a planning document for a refuge as part of the Refuge System, 16 U.S.C. §§ 668dd(a)(3)(A); 668dd(e)(1)(iii), meaning a plan for management of a refuge by the FWS. 16 U.S.C. § 668dd(e)(1)(iv)(E); *see also* 50 C.F.R. § 25.12. It cannot be a plan for a refuge to cease being a refuge and to be transferred out of the System and be managed by an entity other than FWS.

### C. FWS's Notice of Intent to Prepare a CCP/EIS on its Proposal to Transfer the Bison Range to the CSKT Does Not Moot this Case.

FWS's Notice of Intent to prepare CCP with an accompanying EIS that will have as its preferred management option congressional transfer to the CSKT does not moot this case. Defendants have submitted proposed legislation to Congress, which they are still supporting, without the EIS that was due no more than 30 days after that submission a year ago. They are currently in violation of NEPA. They also have not completed the CCP that was due in 2012 and are in violation of the Refuge Act. Even a voluntary cessation of illegal activity, much less a promise to come into compliance with the law in the future, does not moot a case.

"[T]he burden of demonstrating mootness 'is a heavy one.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W.T. Grant Co*., 345 U.S. 629, 632-33 (1953)). "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

> If it did, courts would be compelled to leave the defendant free to return to his old ways.... In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur…. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Friends of the Earth v. Laidlaw Envtl. Services*, 528 U.S. 167, 189 (2000) (internal quotation marks and citations omitted). Indeed, a case is only moot if the court is unable to grant "any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citations and quotation marks omitted; emphasis added).

This rule has even greater force here, because FWS has not even proposed a schedule for completing the CCP/EIS and has provided no evidence that the process has actually started,

much less when it will be completed. Even if it had, this would not meet Defendants' heavy burden to show they will not continue in violation of NEPA and the Refuge Act. FWS has proclaimed its intent to prepare a CCP with NEPA documentation for the Bison Range since 1996, FWS 000237-47, but has failed to produce even a draft CCP or NEPA document in the more than 20 years since then. Defendants have a longstanding pattern of putting preparation of the CCP/NEPA document on hold pending the institution of a new AFA, FWS 000749; FWS 000806; FWS 000831; or, now, pending the proposed transfer to the CSKT. FWS 001022.

Moreover, FWS has repeatedly asked for public comments, first on scoping a CCP in 1997, FWS 000323-24, then on scoping an EA for a new AFA in 2012 and on the draft EA in 2014, 79 Fed. Reg. 45452-53, only to ignore those comments and abandon the tasks altogether. The record shows that Defendants had no intention of producing a CCP/EIS once they had proposed to transfer the Bison Range, FWS 001022, but only proposed to do so after the lack of an EIS and CCP was challenged in this lawsuit. There is no reason to believe that Defendants are now on a sincere path to come into compliance with NEPA and the Refuge Act. Defendants could not possibly prove that their violation of these laws "could not reasonably be expected to recur," or even that it will not continue indefinitely.

## VII. CONCLUSION

Defendants have violated NEPA by failing to prepare an EIS for their legislative proposal to transfer the Bison Range to the CSKT. Plaintiffs request that the Court declare that Defendants are in violation of NEPA, and order them to cease any activity in support of the proposed transfer legislation until an EIS is completed.

The Court should also order Defendants to inform Congress that their proposal to transfer the Bison Range was not legally presented because it was not accompanied by an EIS.

Defendants should be ordered to withdraw their January 18, 2017 Notice of Intent, which violates the law in two ways. First, it sets forth a preferred alternative of legislative transfer of the Bison Range without having complied with NEPA for such a proposal. Second, it fails to comply with the Refuge Act, which requires that CCPs be plans for the management of a National Wildlife Refuge as part of the NWRS, and cannot be plans to transfer a refuge out of management by the FWS and out of the NWRS.

Plaintiffs also ask the Court to declare that Defendants are in violation of the Refuge Act due to their failure to complete a CCP for the Bison Range by the statutory deadline of 2012, and order that Defendants expeditiously prepare and complete a CCP for the Bison Range on a schedule to be approved by and enforceable by the Court. The Court should order that the CCP comply with the Refuge Act by setting forth a plan for management of the Bison Range as a National Wildlife Refuge and part of the National Wildlife Refuge System, and be prepared in accordance with all of the statutory and regulatory requirements for CCPs.

Plaintiffs also request an award of attorneys' fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*

Respectfully submitted,

/s/ Paula Dinerstein________

Paula Dinerstein (D.C. Bar No. 333971)
Public Employees for Environmental Responsibility (PEER)
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202-265-7337
pdinerstein@peer.org